ARMSTRONG BROS. TOOL CO.; Bergman Tool Manufacturing Co., Inc.; Duro Metal Products Company; Milwaukee Tool & Equipment Co., Inc.; H. K. Porter, Inc.; Proto Tools Division, Ingersoll Rand Company; Tool Group, Dresser Industries, Inc.; and the Wright Tool & Forge Company, Plaintiffs,

v.

UNITED STATES (Daido Corporation, Steelcraft Tools Division, Party-In-Interest), Defendant.

Court No. 77–8–02005.
C.D. 4838.

United States Customs Court.

Jan. 28, 1980.

Frederick L. Ikenson, Washington, D. C., for plaintiffs.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, Commercial Litigation Branch, Joseph I. Liebman, Atty. in Charge, Field Office for Customs Litigation and Sidney N. Weiss, Trial Atty., New York City, for defendant.

Tanaka, Walders & Ritger, Washington, D. C. (H. William Tanaka, Lawrence R. Walders and Wesley K. Caine, Washington, D. C., of counsel), for the party-in-interest.

NEWMAN, Judge:

## INTRODUCTION

Plaintiffs, American manufacturers and/or wholesalers of certain hand tools, contest the negative injury determination of the United States Tariff Commission ("Commission")[1] in *Wrenches, Pliers, Screwdrivers, and Metal-Cutting Snips and Shears From Japan,* Investigation No.

AA1921–141 (39 FR 38133 (1974), under the Antidumping Act of 1921, as amended (19 U.S.C. § 160, *et seq.* (1970)). This action has been brought under the provisions of 28 U.S.C. § 1582(b) (1976), 28 U.S.C. § 2632(a) (1976) and 19 U.S.C. § 1516(c) (1976). Daido Corporation, Steelcraft Tools Division, the party-in-interest, is the consignee of New York, New York consumption entry No. 77–471888, covering merchandise which falls within the description "wrenches, pliers, screwdrivers, and metal-cutting snips and shears from Japan".[2]

In this action, plaintiffs seek to overturn the negative injury determination reached by the Commission on October 21, 1974, viz., that "an industry in the United States is not being injured or is not likely to be injured, or is not prevented from being established, by reason of the importation of wrenches, pliers, screwdrivers and metal-cutting snips and shears from Japan that are being, or are likely to be, sold at less than fair value ["LTFV"] within the meaning of the Antidumping Act of 1921, as amended".[3] Specifically, plaintiffs allege that the Commission's negative injury determination is erroneous as a matter of law, is arbitrary and capricious, and is not supported by substantial evidence. Plaintiffs seek an order setting aside the Commission's determination and directing the Secretary of the Treasury to publish a finding of dumping, with the result that dumping duties will be assessed, where appropriate, on entries of the subject hand tools from Japan.

This action is presently before me on plaintiffs' motion for summary judgment, and the cross-motions for summary judgment by defendant and the party-in-interest. The parties assert there is no genuine issue of fact. I have studied the massive

1. The United States Tariff Commission was subsequently renamed the United States International Trade Commission by section 171(a) of the Trade Act of 1974. (19 U.S.C. § 2231(a) (1976).)

2. Pursuant to 19 U.S.C. § 1516(f) (1976) the consignee or his agent has the right to appear and be heard as a party in this civil action.

3. Preliminarily, the Treasury Department determined that the subject hand tools from Japan are being, or are likely to be, sold in the United States at less than fair value within the meaning of the Antidumping Act, 1921, as amended.

administrative record and the excellent memoranda of law submitted by counsel; and for the reasons hereinafter expressed, I find that *no justiciable issue of fact is presented in this case,* and that defendant and the party-in-interest are entitled to summary judgment dismissing this action.

## STATUTES INVOLVED

The statutory provisions relevant to this action are:

Section 201, Antidumping Act of 1921, as amended, 19 U.S.C. § 160 (1970):

Initiation of investigation; injury determination; findings; withholding appraisement; publication in Federal Register

(a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary") determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at less than its. fair value, he shall so advise the United States Tariff Commission, and the said Commission shall determine within three months thereafter whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States. The said Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the affirmative, the Secretary shall make public a notice (hereinafter in sections 160 to 171 of this title called a "finding") of his determination and the determination of the said Commission. For the purposes of this subsection, the said Commission shall be deemed to have made an affirmative determination if the Commissioners of the said Commission voting are evenly divided as to whether its determination should be in the affirmative or in the negative. The Secretary's finding shall include a description of the class or kind of merchandise to which it applies in such detail as he shall deem necessary for the guidance of customs officers.

(b) Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, the Secretary has reason to believe or suspect, from the invoice or other papers or from information presented to him or to any person to whom authority under this section has been delegated, that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the constructed value), he shall forthwith publish notice of that fact in the Federal Register and shall authorize, under such regulations as he may prescribe, the withholding of appraisement reports as to such merchandise entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping has been raised by or presented to him or any person to whom authority under this section has been delegated, until the further order of the Secretary, or until the Secretary has made public a finding as provided for in subdivision (a) in regard to such merchandise.

(c) The Secretary, upon determining whether foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and the United States Tariff Commission, upon making its determination under subsection (a) of this section, shall each publish such determination in the Federal Register, with a statement of the reasons therefor, whether such determination is in the affirmative or in the negative.

Section 202(a), Antidumping Act of 1921, as amended, 19 U.S.C. § 161(a) (1970):

Amount of duty to be collected; determination of foreign market value of goods

(a) In the case of all imported merchandise, whether dutiable or free of duty, or a class or kind as to which the Secretary of the Treasury has made public a finding as provided for in section 160 of this title, entered, or withdrawn from warehouse, for consumption, not more

than one hundred and twenty days before the question of dumping was raised by or presented to the Secretary or any person to whom authority under said section has been delegated, and as to which no appraisement has been made before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the constructed value) there shall be levied, collected, and paid, in addition to any other duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

Section 516, Tariff Act of 1930, as amended, 19 U.S.C. § 1516 (1976):

Petitions by American manufacturers, producers, or wholesalers

(a) Classification, rate of duty, countervailing duty, and antidumping duty furnished upon request; petition; contents

The Secretary shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification, the rate of duty, the additional duty described in section 1303 of this title (hereinafter in this section referred to as "countervailing duties"), if any, and the special duty described in section 161 of this title (hereinafter in this section referred to as "antidumping duties"), if any, imposed upon designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the appraised value is too low, that the classification is not correct, that the proper rate of duty is not being assessed, or that countervailing duties or antidumping duties should be assessed, he may file a petition with the Secretary setting forth (1) a description of the merchandise, (2) the appraised value, the classification, or the rate or rates of duty that he believes proper and (3) the reasons for his belief including, in appropriate instances, the reasons for his belief that countervailing duties or antidumping duties should be assessed.

(b) Determination of petition; notification to petitioner; procedures for countervailing duties and antidumping duties

If, after receipt and consideration of a petition filed by an American manufacturer, producer, or wholesaler, the Secretary decides that the appraised value of the merchandise is too low, that the classification of the article or rate of duty assessed thereon is not correct, or that countervailing duties or antidumping duties should be assessed, he shall determine the proper appraised value or classification, rate of duty, or countervailing duties, or antidumping duties and shall notify the petitioner of his determination. Except for countervailing duty and antidumping duty purposes, all such merchandise entered for consumption or withdrawn from warehouse for consumption more than thirty days after the date such notice to the petitioner is published in the weekly Customs Bulletin shall be appraised or classified or assessed as to rate of duty in accordance with the Secretary's determination. For countervailing duty purposes, the procedures set forth in section 1303 of this title shall apply. For antidumping duty purposes, the procedures set forth in section 160 of this title shall apply.

(c) Determination of correctness of initial appraised value, classification, rate of duty, or non-assessment of countervailing duties or antidumping duties; contest by petitioner; procedure

If the Secretary decides that the appraised value or classification of the articles or the rate of duty with respect to which a petition was filed pursuant to subsection (a) of this section is correct, or that countervailing duties or antidumping duties should not be assessed, he shall so inform the petitioner. If dissatisfied with the decision of the Secretary, the petitioner may file with the Secretary, not later than thirty days after the date of the decision, notice that he desires to contest the appraised value or classification of, or rate of duty assessed upon or

the failure to assess countervailing duties or antidumping duties upon, the merchandise. Upon receipt of notice from the petitioner, the Secretary shall cause publication to be made of his decision as to the proper appraised value or classification or rate of duty or that countervailing duties or antidumping duties should not be assessed and of the petitioner's desire to contest, and shall thereafter furnish the petitioner with such information as to the entries and consignees of such merchandise, entered after the publication of the decision of the Secretary at such ports of entry designated by the petitioner in his notice of desire to contest, as will enable the petitioner to contest the appraised value or classification of, or rate of duty imposed upon or failure to assess countervailing duties or antidumping duties upon, such merchandise in the liquidation of one such entry at such port. The Secretary shall direct the appropriate Customs officer at such ports to notify the petitioner by mail immediately when the first of such entries is liquidated.

(d) Contest of Secretary's determination that foreign merchandise is not being sold in United States at less than fair value or that bounty or grant is not being paid

Within 30 days after a determination by the Secretary—

(1) under section 160 of this title, that a class or kind of foreign merchandise is not being, nor likely to be, sold in the United States at less than its fair value, or

(2) under section 1303 of this title that a bounty or grant is not being paid or bestowed,

an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination may file with the Secretary a written notice of a desire to contest such determination. Upon receipt of such notice the Secretary shall cause publication to be made thereof and of such manufacturer's, producer's, or wholesaler's desire to contest the determination.

Within 30 days after such publication, such manufacturer, producer, or wholesaler may commence an action in the United States Customs Court contesting such determination.

(e) Appraisal, classification, and liquidation of entries of merchandise covered by published decisions of the Secretary

Notwithstanding the filing of an action pursuant to section 2632 of title 28, merchandise of the character covered by the published decision of the Secretary (when entered for consumption or withdrawn from warehouse for consumption on or before the date of publication of a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, not in harmony with the published decision of the Secretary) shall be appraised or classified, or both, and the entries liquidated, in accordance with the decision of the Secretary and, except as otherwise provided in this chapter, the final liquidations of these entries shall be conclusive upon all parties.

(f) Consignee or his agent as party in interest before the Customs Court

The consignee or his agent shall have the right to appear and to be heard as a party in interest before the United States Customs Court.

(g) Appraisement, classification, and assessment of duty of merchandise covered by published decision of the Secretary in accordance with final judicial decision of Customs Court or Court of Customs and Patent Appeals sustaining cause of action in whole or in part; suspension of liquidation of entries

If the cause of action is sustained in whole or in part by a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, merchandise of the character covered by the published decision of the Secretary, which is entered for consumption or withdrawn from warehouse for consumption after the date of publica-

tion of the court decision, shall be subject to appraisement, classification, and assessment of duty in accordance with the final judicial decision in the action, and the liquidation of entries covering the merchandise so entered or withdrawn shall be suspended until final disposition is made of the action, whereupon the entries shall be liquidated, or if necessary, reliquidated in accordance with the final decision.

(h) Regulations implementing required procedures

Regulations shall be prescribed by the Secretary to implement the procedures required under this section.

## ISSUE PRESENTED

The core issue is whether the Commission's negative determination was arbitrary, capricious or otherwise contrary to law.

## BACKGROUND

To put the Commission's determination in proper perspective, it would be helpful at this juncture to briefly set forth the procedures applicable under the Antidumping Act as succinctly summarized by Judge Maletz in *Voss International Corp. v. United States*, 432 F.Supp. 205, 78 Cust.Ct. 130, 131, n. 1, C.D. 4698 (1977):

The Antidumping Act provides in general that if a foreign exporter sells merchandise to the United States at a price less than its "fair value," i. e., the price charged by the exporter in his home market—with resultant injury to a U.S. industry—a special dumping duty will be assessed upon the importation of the merchandise. If the exporter and importer are not related, this duty is measured by the difference between the higher "foreign market value" and the lower price charged the U.S. importer. The question as to whether merchandise is being sold at less than fair value is determined by the Secretary of the Treasury. If the Secretary makes an affirmative finding in this regard, the question as to whether there is injury is determined by the United States Tariff Commission (now known

as the United States International Trade Commission). If the Commission makes a determination of injury, the Secretary makes and publishes a finding of dumping. See, e. g., *F. W. Myers & Co., Inc., et al. v. United States*, 376 F.Supp. 860, 862, 72 Cust.Ct. 219, 220, C.D. 4544 (1974).

■ The Court's jurisdiction under 19 U.S.C. § 1516(c) to review the Commission's negative injury determination is not in dispute. In view of Chief Judge Re's well-reasoned opinion in *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest)*, 450 F.Supp. 1178, 80 Cust.Ct. 226, C.R.D. 78–2 (1978), there can be no doubt that the Customs Court, rather than the district courts, has exclusive jurisdiction to review a negative injury determination by the Commission under the Antidumping Act. See also my opinions in *Armstrong Bros. Tool Co. et al. v. United States (Great Neck Saw Manufacturing, Incorporated, Party-in-Interest)*, 453 F.Supp. 889, 80 Cust.Ct. 160, C.D. 4751 (1978), *modified on rehearing*, 81 Cust.Ct. 162, C.R.D. 78–14 (1978), and *Sprague Electric Company v. United States (Capar Components Corp., Party-in-Interest)*, 462 F.Supp. 966, 81 Cust.Ct. 168, C.R.D. 78–18 (1978).

The highlights of the administrative history of this action are undisputed, and may be briefly summarized:

1. On September 25, 1973 an Antidumping Proceeding Notice issued by the Treasury Department was published in the *Federal Register* (38 FR 26738 (1973)), advising that an investigation was being instituted to determine whether certain "Non-Powered Hand Tools From Japan" were being or were likely to be sold at LTFV.

2. On March 25, 1974 a Withholding of Appraisement Notice was published in the *Federal Register* (39 FR 11122 (1974)).

3. On June 21, 1974 the Treasury Department published in the *Federal Register* a Determination of Sales at LTFV covering "Non-Powered Hand Tools From Japan" (39 FR 22287 (1974)); and on July 23, 1974 the Treasury Department published in the *Federal Register* an amendment to the

aforementioned determination, restricting its scope to wrenches, pliers, screwdrivers, and metal-cutting snips and shears from Japan (39 FR 26758 (1974)).

4. On July 30, 1974 the Commission published in the *Federal Register* a notice of its Investigation No. AA1921–141, and of a public hearing in which all parties would be "given an opportunity to be present, to produce evidence, and to be heard" (39 FR 27614 (1974)). Thereafter, on August 20–23, 1974 the Commission held a hearing at which testimony and exhibits were received. All public testimony was subject to cross-examination; and subsequently the Commission received post-hearing briefs.

5. On October 21, 1974 a negative injury determination was reached by the unanimous vote of five Commissioners, namely, Chairman Bedell, Vice Chairman Parker, and Commissioners Moore, Ablondi and Leonard. Commissioner Minchew did not participate in the decision.

6. On October 29, 1974 the Commission published its negative injury determination in the *Federal Register,* together with a Statement of Reasons. Commissioner Leonard submitted a separate Statement of Reasons. (39 FR 38133 (1974).) In arriving at its determination, "the Commission gave due consideration to all written submissions from interested parties, evidence adduced at the hearing, and all factual information obtained by the Commission's staff from questionnaires, personal interviews, and other sources". *Id.*

No question has been raised concerning plaintiffs' compliance with the administrative prerequisites to the initiation of a civil action prescribed by 19 U.S.C. § 1516(a) and (c).

During the discovery phase of this litigation, defendant moved for a protective order seeking, among other things, to prohibit plaintiffs from conducting discovery into matters beyond the Commission's notice of investigation and hearing and the Commission's negative injury determination and

Statement of Reasons. The defendant's motion was decided by this court on June 27, 1978 culminating in an order which, in pertinent part, reads (80 Cust.Ct. 252, 253–54, C.R.D. 78–5 (1978)): [4]

2. That the Secretary of the United States International Trade Commission, Kenneth R. Mason, shall prepare and transmit to Joseph E. Lombardi, Clerk of the United States Customs Court, on or before July 28, 1978, the following: (1) a certified copy of the transcript of proceedings and exhibits introduced before the Commission in investigation AA1921–141; (2) certified copies of all written submissions, questionnaires, reports and all other documents relating to investigation AA1921–141; and (3) all other things in the files of the Commission relating to the investigation. *Cf.* Judge Maletz' order in *Pasco Terminals, Inc. v. United States,* 80 Cust.Ct. 249, C.R.D. 78–3 (1978), and also his unpublished order in the same case entered on May 8, 1978. See also my order in *Sprague Electric Company v. United States (Capar Components Corp., Party-in-Interest),* 80 Cust.Ct. 256, C.R.D. 78–7 (1978), entered concurrently herewith.

3. That denial of defendant's present motion for a protective order shall be without prejudice to renewal respecting any documents or things that were received by the Commission on a confidential basis or are otherwise privileged.

4. That the basis of this order is to enable the court to determine whether or not the Commission's finding of injury was, among other things, arbitrary, an abuse of discretion, or otherwise contrary to law. See, e. g., *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Imbert Imports, Inc. v. United States,* 475 F.2d 1189, 60 CCPA 123, C.A.D. 1094 (1973); *Suwannee Steamship Company v. United States,* 435

4. This order was modified by a protective order entered on August 1, 1978, and was further modified in an order entered on December 29,

1978, wherein the claim of privilege was sustained as to three documents.

F.Supp. 389, 79 Cust.Ct. 19, C.D. 4708 (1977); *Cf. Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). See also questions and answers attached to the letter of Daniel Minchew, Chairman, United States International Trade Commission, November 16, 1977, reproduced in *Hearing before the Subcommittee on Trade, House Committee on Ways and Means, on the Adequacy and the Administration of the Antidumping Act of 1921* (95th Cong., 1st Sess. 1977) pp. 65–66.

■ Pursuant to the foregoing order, as modified, the Secretary of the Commission transmitted what are represented to be all of the documents and things enumerated and described above that were locatable, with the exception of the three documents that were claimed by the Commission Chairman to be privileged.[5] Defendant, however, again advances the argument that this Court's review is limited to the Commission's Statement of Reasons. But defendant's position respecting the scope of review has been consistently rejected by a long and uninterrupted line of authorities. See *Pasco Terminals, Inc. v. United States*, 80 Cust.Ct. 249, C.R.D. 78–3 (1978); *Armstrong Bros. Tool Co. et al. v. United States (Daido Corporation, Steelcraft Tools Division, Party-in-Interest)*, 80 Cust.Ct. 252, C.R.D. 78–5 (1978); *Sprague Electric Company v. United States (Capar Components Corp., Party-in-Interest)*, 80 Cust.Ct. 256, C.R.D. 78–7 (1978); *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest)*, 81 Cust.Ct. 159, C.R.D. 78–13 (1978), and authorities cited therein. See also *Michelin Tire Corporation v. United States*, 469 F.Supp. 270, 82 Cust.Ct. ——, C.R.D. 79–6 (1979), *application for extraordinary writs denied sub nom. United States v. James L. Watson, Judge, United States Customs Court; Michelin*

*Tire Corporation, Party-in-Interest*, 66 CCPA ——, C.A.D. 1230 (1979). Accordingly, I have carefully reviewed the entire administrative record transmitted to the Court by the Commission, and not merely the Statement of Reasons.

OPINION

I

Our Appellate Court has repeatedly stressed the broad discretionary authority vested in the Commission to determine the existence or likelihood of injury by reason of LTFV imports and the limited standard of judicial review applicable to the Commission's determinations. *City Lumber Co. et al. v. United States*, 457 F.2d 991, 59 CCPA 89, C.A.D. 1045 (1972); *Imbert Imports, Inc., et al. v. United States*, 475 F.2d 1189, 60 CCPA 123, C.A.D. 1094 (1973), and cases cited therein.

In *City Lumber*, the Court of Customs and Patent Appeals articulated the standard of judicial review applicable to the Commission's injury determinations under the Antidumping Act as follows (457 F.2d at 994, 59 CCPA at 92):

As the Appellate Term opinion observes, under the Antidumping Act Congress delegated to the Commission a broad discretionary power to determine whether an industry is being, or is likely to be, injured by the sale of imports at less than fair value. The courts have a very limited power of review over the Commission's determinations. It is not the judicial function to review or to weigh the evidence before the Commission or to question the correctness of findings drawn therefrom. *Kleberg & Co. (Inc.) v. United States*, 71 F.2d 332, 21 CCPA 110, T.D. 46446 (1933); compare *United States v. George S. Bush & Co.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259

---

5. These documents and things, comprising the voluminous administrative record, are listed on two numbered indexes, which were also transmitted to the Court, entitled "List No. 1 Public Documents Transmitted to the United States Customs Court", and "List No. 2 Confidential Documents Transmitted to the United States Customs Court". Public documents are identified on List No. 1, while those documents which the Commission treated as containing confidential business information and which are subject to the terms of the stipulation for protective order are identified on List No. 2.

(1940). As stated in *Kleberg*, our review of determinations of injury or likelihood of injury in antidumping cases does not extend beyond determining whether the Commission has acted within its delegated authority, has correctly interpreted statutory language, and has correctly applied the law. As indicated in the *Bush* opinion, "No question of law is raised when the exercise of * * * discretion is challenged."

Continuing, the Appellate Court went on to observe (457 F.2d at 996, 59 CCPA at 95):

* * * We deem appellants' admission to show that there was *substantial evidence to support the Commission's determination*, which eliminates one of their arguments for its invalidity. Moreover, the substance of this argument, in our view, is that appellants would have us weigh the evidence before the Commission. We need cite no authority for the proposition that we cannot do that because in their brief below appellants admit that "the court may neither substitute its judgment in factual matters for that of the Tariff Commission in an injury determination under the Antidumping Act, nor may it weigh the evidence before the Commission * * *." The Commission is under no obligation either to disclose all of the evidence in its possession nor to state in meticulous detail exactly on what basis it applies that evidence in determining injury or likelihood thereof. This point is, therefore, without merit. [Emphasis added.]

The standard of review enunciated in *City Lumber* was quoted and reaffirmed in *Imbert Imports, supra.* There, the Appellate Court further stated (475 F.2d at 1192, 60 CCPA at 127):

* * * In short, we find that the *findings of the Commission are supported by substantial evidence*, and that the factors pointed out in the Chairman's dissent are not of sufficient moment to establish that the decision of the majority was *arbitrary.*

Accordingly, we are satisfied that *the Commission here acted within its delegat-*

ed authority and correctly interpreted and applied the law. In fact, we think, as did the Appellate Term, that the determination would pass the *test as not being arbitrary, an abuse of discretion, or contrary to law*, even if the more extensive scope of review under the Administrative Procedure Act (the provisions now 5 U.S.C. § 706) were appropriate, as appellant contends. As it is, we make no express holding with regard to the applicability of that Act. [Emphasis added.]

Recently, in *Pasco Terminals, Inc. v. United States*, 477 F.Supp. 201, 83 Cust.Ct. ——, C.D. 4823 (1979), the Court addressed the discretionary authority of the Commission in injury determinations under the Antidumping Act and the applicable standard of judicial review. On that aspect of the case, the Court made the following pertinent observations (477 F.Supp. at 220, 83 Cust.Ct. at ——):

It is therefore apparent from its determination that the Commission properly employed criteria which are relevant to the determination as to whether "injury" or "likelihood of injury" in fact existed. *The relative weight it gave to those criteria was a matter of discretion and expert judgment.*

In sum, the determination and statements of reasons covered all the relevant points and showed a rational and defensible basis for the affirmative determination. Accordingly, the determination must be upheld. For it is basic that having been delegated discretionary authority by the Congress, the Commission's determination may not be disturbed by the court when, as here, it had a rational basis in fact and was not contrary to law. See, e. g., *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 [, 93 S.Ct. 1241, 36 L.Ed.2d 106] (1971); *Suwannee Steamship Co. v. United States*, 79 Cust.Ct. 19, 23–24, C.D. 4708, 435 F.Supp. 389 (1977). *And since the Commission has been delegated discretionary authority, it is not the function of the court to weigh the evidence considered by the Commission, determine the credibility of*

*the witnesses appearing at the hearing, and substitute its judgment for that of the Commission*; indeed, the Commission decision, if rational and not contrary to law, must be upheld by the court *even though that decision is not one the court would have reached had the question first arisen in judicial proceedings.* See, e. g., *Imbert Imports, Inc. v. United States*, 475 F.2d 1189 [, 1192] 60 CCPA 123, 127, C.A.D. 1094 (1973); *City Lumber Co. v. United States*, 64 Cust.Ct. 826, 832, 834, A.R.D. 269, 311 F.Supp. 340 (1970), *aff'd*, 457 F.2d 991, 59 CCPA 89, *supra.* [Emphasis added.]

Again, in *ASG Industries, Inc., et al. v. United States*, 467 F.Supp. 1200, 82 Cust.Ct. 101, C.D. 4794 (1979) *(appeal pending)*, Judge Maletz in a scholarly opinion considered *in extenso* the scope of review in countervailing duty cases, and alluded to the Commission's finding of injury under the Antidumping Act (467 F.Supp. at 1236–1237, 82 Cust.Ct. at 146):

Defendant also relies on *Pasco Terminals, Inc. v. United States*, 80 Cust.Ct. 249, C.R.D. 78–3 (1978), where this court held that the scope of review of an International Trade Commission's finding of injury under the Antidumping Act was, among other things, arbitrary or capricious, an abuse of discretion, or otherwise contrary to law. *But there again, a determination of whether or not there was injury under the law is committed by Congress to the sound discretion of the Commission.* Furthermore, under the Commission's practice, an administrative record is made, hearings are held, cross-examination of witnesses is permitted and specific and detailed findings are made. [Emphasis added.]

And in the wide-ranging Trade Agreements Act of 1979 (Pub.L.No.96–39, 93 Stat. 144, enacted July 26, 1979, Congress added a new section 516A to the Tariff Act of 1930 wherein the scope and standards of judicial review in antidumping and counter-

vailing duty cases are specifically addressed. The new section 516A, of course, is not applicable in the present case. Significantly, however, in the Senate Finance Committee's report (S.Rep.No.96–249, 1st Sess. 251, U.S.Code Cong. & Admin.News 1979, pp. 3, 259) accompanying the bill that was enacted (H.R.4537), Congress stated its understanding of the existing standard of review applicable to determinations of the Commission:

*Scope and standard of review.*—Section 516A clearly defines the scope and standard of review in suits challenging antidumping and countervailing determinations and orders. *Currently, the state of the law in this area is unclear and conflicting.*

Subsection (b) of new section 516A sets forth the standard of review for those antidumping and countervailing duty determinations which will now be reviewable. *Under present law, determinations made by the International Trade Commission have been set aside only where found to be arbitrary or contrary to law.* * * * [Emphasis added.]

See also *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., et al.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974), *reh. denied*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Citizens to Preserve Overton Park, Inc., et al. v. Volpe, Secretary of Transportation, et al.*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 36 L.Ed.2d 106 (1971); Metzger & Musrey, "Judicial Review of Tariff Commission Actions and Proceedings", 56 Cornell L.Rev. 285, 320–30 (Jan. 1971).

## II

Congressional intent to provide a wide latitude within which the Commission may determine the existence or nonexistence of injury under the Antidumping Act is manifest from the absence in the statute of any legislative roadmap or compass respecting the indicia of injury.[6] Absent such

---

**6.** Moreover, the broad investigatory discretion of the Commission in injury determinations was made clear by Congress in providing that

the Commission could make its injury determination "after such investigation as it deems necessary". 19 U.S.C. § 160(a) (1970). At the

Congressional guidance, the Commission has itself employed a number of reasonable indicia of injury in its investigations. Among these indicia are the following: (1) price depression of the impacted competitive products; (2) price suppression—e. g., although domestic production costs have increased, competition from LTFV imports precludes price increases; (3) market penetration by the LTFV imports; (4) documented lost sales of domestic manufacturers to the LTFV imports; (5) operation of domestic production facilities at less than normal capacity; (6) plant closures and unemployment; (7) foreign capacity to produce for export; (8) lost profits.

"Indicia used by the Commission to determine whether, in the absence of actual injury, an industry 'is likely to be injured' within the meaning of the Antidumping Act, 1921, include increasing LTFV imports and the capacity of the foreign exporters to continue to export in the same or larger volumes so that injury is imminent and not conjectural". See the questions and answers attached to the letter of Daniel Minchew, Chairman, United States International Trade Commission, November 16, 1977, reproduced in *Hearing Before the Subcommittee on Trade, House Committee on Ways and Means, on the Adequacy and the Administration of the Antidumping Act of 1921* (95th Cong., 1st Sess. 1977), at 62. See also the separate Statement of Reasons of Commissioner Stern in *Certain Steel Wire Nails From Canada,* Investigation No. AA1921–189, 44 FR 7840 at 7842 (1979).

It is apparent from the above-enumerated indicia that an injury determination in an antidumping case is multifaceted, and involves analysis of complex economic and financial data having an unique interrelationship in each particular case. From the Commission's Statement of Reasons in the present case, it appears that the Commission considered and carefully analyzed a number of pertinent economic and financial factors, including trends and levels of domestic industry shipments, exports, profits, prices, unfilled orders and other relevant factors. Thus, in its Statement of Reasons, the Commission found (39 FR 38133):

First, the domestic and Japanese tools are different in that "[t]he domestic industry produces primarily forged tools, while the Japanese articles sold at less than fair value have been mostly cast or partly forged and cast".

Second, the markets in the United States for the domestic tools and the Japanese tools are different. On this aspect, the Commission found that:

Hand tools, including the types found by the Treasury to have been sold at less than fair value, are sold in the United States in several differentiated markets—a market for higher priced, professional-quality tools of the types considered here serviced primarily by hardware stores; one for mid-priced, medium-quality tools serviced predominantly by department stores; and one for low-priced, low-quality tools serviced mostly by discount outlets, drug stores, and supermarkets. The bulk of the domestic tools (probably more than 75 percent) are sold in the market for professional tools, and most of the remainder in the market for medium-quality tools. In contrast, the Japanese tools sold at less than fair value are sold chiefly in the market for low-priced tools.

Sales of tools in department stores, drug stores, supermarkets, and discount outlets are a relatively recent development, in contrast with the more traditional hardware store outlet. Sales in the

---

time of the investigation in this case, there was no requirement for any type of hearing, although hearings were in fact held on August 20–23, 1974. The 1974 amendments to the Antidumping Act required for the first time that the Commission must hold a hearing when requested by the foreign manufacturer, the domestic importer, or any domestic manufacturer, producer, or wholesaler of the merchandise.

19 U.S.C. § 160(d)(1) (1976). Hence, prior to the 1974 amendments, the Commission held hearings such as those in the present case, although it was not required to do so by the statute. Moreover, the Commission need not base its injury determination upon the record made at the hearing. *Pasco Terminals, Inc. v. United States,* 477 F.Supp. 201, 83 Cust.Ct. ——, C.D. 4823 (1979).

newer outlets comprise the fastest growing segment of the market. Several importers are credited with the development of this market through such innovative marketing devices as racking a full line of tools in blistered cards, which at the time of its introduction was untried by domestic hand-tool producers. The imported tools so marketed were generally of a lower quality and price than the traditional professional tools.

Third, "[d]omestic shipments of the tools involved increased consistently, being about 39 percent greater in 1973 than in 1971".

Fourth, "[e]xports of such tools by domestic producers increased from $28 million in 1971 to $37 million in 1973 and further to $27 million in the first half of 1974 (when they equalled imports)".

Fifth, during the period of investigation, demand for domestic products increased which "was reflected in higher unfilled orders, which rose from an approximate 3 to 4 months backlog at year-end 1971 to 5 to 6 months at year-end 1973".

Sixth, the Commission found no evidence of either price depression or price suppression of the domestic tools, and that the prices of the domestic tools rose at the same rate as other hand-tool prices.

Seventh, the average profitability of the domestic hand-tool industry was maintained during the period of the investigation (1971–73). Whatever reduced operating margins may have been experienced by the domestic industry was found to be caused primarily by increased raw material costs in a period of national price controls, and in one instance by a prolonged strike. The Commission could find no evidence of causality between the LTFV sales of the involved Japanese hand tools and any decreased profit margins.

Eighth, respecting the likelihood of injury, the Commission concluded:

The evidence before the Commission indicates not only that the domestic industry has not been injured, but that there is no likelihood of injury within the terms of the antidumping statute. Domestic shipments of hand tools were higher in the first half of 1974 than in the corresponding period of 1973, responding to increased domestic consumption. The prices of both the domestically produced and Japanese hand tools involved have continued to rise, but the prices of the Japanese articles have increased more steeply than those of the domestic. The steeper price increase for the Japanese articles appears to· have resulted mostly from rapidly rising Japanese costs, as well as the changes in the dollar-yen exchange rate.

That the Commission proceeded on a correct legal theory is evident from the following excerpt from the Statement of Reasons:

The Antidumping Act, 1921, as amended, requires that the Tariff Commission find two conditions satisfied before an affirmative determination can be made. First, there must be injury, or likelihood of injury, to an industry in the United States, or an industry in the United States must be prevented from being established. Second, such injury or likelihood of injury or prevention of establishment of an industry must be "by reason of" the importation into the United States of the class or kind of foreign merchandise which the Secretary of the Treasury has determined is being, or is likely to be, sold at less than fair value (LTFV). [Footnote omitted.]

The separate Statement of Reasons for the negative determination of Commissioner Leonard explicitly details the lack of injury to the domestic industry, and therefore I have set out his reasons at length (39 FR 38134):

\*　　\*　　\*　　\*　　\*　　\*

### DIFFERENT MARKETS

The specified hand tools from Japan sold, or likely to be sold, at LTFV generally are manufactured by different processes and are designed for a specific market that is not fully serviced by the bulk of the domestic tools. The Japanese and domestic tools, in many cases, are not alike. The specified hand tool imports from Japan have been largely concentrat-

ed in the "do-it-yourself" household market which has not been supplied traditionally by U.S. producers. These tools are of lower quality and are relatively inexpensive. Over 90 percent of the specified hand tools imported from Japan are distributed to the household market. This household market is serviced by retail outlets such as discount stores, supermarkets and drug stores for sale to the occasional user or impulse buyer whose trade or profession does not involve the regular use of hand tools. This market is generally characterized by its demand for lower-priced hand tools.

Domestic manufacturers traditionally have produced the specified hand tools of high quality for professional use. The traditional markets for the bulk of the domestically produced specified hand tools are independent distributors who sell to hardware stores and to department stores catering to tradesmen such as machinists, carpenters, plumbers, and general repairmen. In 1973, for example, over 75 percent of total domestic shipments were sold for such trade or professional use.

Moreover, domestic producers have alleged that they cannot manufacture profitably the lower quality, relatively inexpensive tools sold in the household market because of prevailing U.S. labor and materials costs. Distributors of the higher quality hand tools generally buy comparatively small quantities of tools of Japanese origin and then only to supplement domestic product lines or for the purpose of providing tools for immediate delivery when domestic hand tools are in short supply. [Footnote omitted.]

Commissioner Leonard then commented (*id.*):

## NO INJURY

*Strong market demand* for the specified hand tools *of all qualities* is illustrated by the increase in apparent domestic consumption over the period 1970–1973. In dollar terms, overall domestic consumption of the tools covered by this investigation were *66 percent larger in 1973* than in 1970. Consumption of *wrenches increased 76 percent; pliers, 26 percent; screwdrivers, 64 percent; and metal-cutting snips and shears, 58 percent.* Domestic shipments of the specified hand tools rose because of increased demand. Domestic shipments of *wrenches increased 66 percent; pliers, 31 percent; screwdrivers, 66 percent; and metal-cutting snips and shears, 52 percent.* Thus, the increase over the period 1970–73 of domestic shipments of the specified hand tools was similar to the increase in total consumption. Imports took a slightly larger share of consumption during this time, and whatever increase imports were able to register in their share of the market seems to have been due to the inability of the domestic producers to satisfy the increased demand.

Unfilled domestic orders for each type of tool increased in 1972 and, with the exception of screwdrivers, again in 1973. Inventories of domestic producers began to decline in 1973 as compared with 1972. The combined effect of increased shipments, increased backlogs of unfilled orders reported to the Commission by producers (confirming the claims of distributors), declining inventories and temporary shortages of component materials during 1973–74 resulted in lengthened delivery times for the specified domestic hand tools and contributed to the demand for imported tools.

During the 1970–1973 period, *U.S. exports of all these tools increased by about 44 percent.* Exports exceeded imports in 1970 and 1971 and again during the first 6 months of 1974. *Due to the increase in demand for the specified hand tools, domestic producers have enlarged existing production facilities, undertaken new plant construction, and registered increases in manhours of production-related workers for the years 1972 and 1973.*

There has been no price depression, as prices of the specified domestic hand tools generally rose between 1971 and 1974. Similarly, there appears to be no evidence of price suppression. Prices for all indus-

trial commodities advanced 7.9 percent from 1971 through 1973, with price advances for all hand tools averaging 8.7 percent. In such a situation, it is difficult to conceive of any price suppression.

The lack of injury to the domestic industry is also reflected in its financial experience. As a share of net sales, *net operating profits of the domestic manufacturers* where the specified hand tools were produced *averaged 11.8 percent in 1971, 12.9 percent in 1972*, and *11.8 percent in 1973*. Although profits in 1973 failed to increase with increased sales, rising material costs and price control regulation were at least in part responsible for the reduction. For the period 1971–1973, the operating profit ratios for the domestic manufacturers of the specific hand tools were equal to or better than other U.S. industries. [Emphasis added.]

Continuing, Commissioner Leonard made the following observations concerning the likelihood of injury (*id.*):

### NO LIKELIHOOD OF INJURY

For there to be likelihood of injury, there must be a realistic connection between a situation that presently exists and what will probably happen should the present situation continue. A trend that indicates future injury must be shown. Given the evidence developed in this investigation, such a connection, such a trend, cannot be made. It would be a flight of fancy to forecast injury to the domestic industry in the future based upon the information at hand.

Demand for the specific hand tools as measured by apparent domestic consumption continued to increase in the first half of 1974 as compared with the first half of 1973, and so did domestic shipments. Prices of both the specified domestic and Japanese hand tools have continued to increase. The two currency revaluations affecting the relationship between the dollar and the yen and rapidly rising Japanese costs by the end of 1973 had substantially reduced price differentials between the specified domestic and Japa-

nese hand tools wherever they competed. During the 12-month period June 1973– June 1974, Japanese prices generally rose at a steeper rate than did U.S. prices for the specified hand tools.

▮ In summary, an analysis of the Statements of Reasons in the present case shows that the Commission considered reasonable criteria in determining whether injury, or the likelihood thereof, existed. The short of the matter is that the Commission found no harm to American industry by reason of the LTFV imports. As the Commission's Statement of Reasons indicates, American industry prospered during the period of the LTFV imports, viz., there were healthy trends in the industry's domestic shipments, exports and average profitability. Moreover, the Commission found no price depression or suppression in the domestic industry. Whatever factors contributed to the reduced operating margins of some domestic producers were found to be purely domestic in origin: i. e., primarily increased raw material costs during a period of price controls, and a strike—*but not LTFV sales*. As further evidence of no injury, the prices for tools of the domestic industry and for all hand tools rose at the same rate. Particularly significant is the fact that during the period of the Commission's investigation the domestic industry experienced great difficulty in filling all its orders. Plainly, an industry which is unable to meet rising demand, while at the same time shipping more merchandise, both domestically and for export, is not an industry being injured by imports. To the contrary, the Commission's findings amply demonstrate that the domestic industry was healthy, robust, and noninjured. The Commission's determination that there was no likelihood of injury is equally well founded. On that score, the Commission pointed to the continuing trend of increased domestic shipments, and it further noted that prices for the Japanese tools in question were rising at rates "more steeply than those of the domestic" (39 FR 38133).

## III

Plaintiffs maintain that the Commission should have found from the record transmitted to the Court that the LTFV pricing afforded a competitive advantage to the subject Japanese tools resulting in significant levels of market penetration of the imports accompanied by serious market disruption in the form of lost sales, preclusion from major domestic markets, restraints on investment in productive capacity, price suppression, decreased profit margins, and slowdowns in domestic shipments and production. Further, plaintiffs argue that the Commission's findings in support of its negative determination have no rational basis in fact, are arbitrary, capricious and not supported by substantial evidence. Plaintiffs are particularly critical of the Commission's findings concerning the character of the United States market for the tools in question and the respective natures of the domestically produced tools and the imports sold at LTFV. These findings are relevant to the competitiveness of the LTFV imports with the domestically produced hand tools. On this aspect, plaintiffs urge that had the Commission found that the LTFV imports competed directly with the domestic hand tools, it would have been obligated to find injury as a matter of law.

I agree with the party-in-interest's contention that plaintiffs' arguments relating to the administrative record are directed, essentially, at discretionary findings by the Commission. As conceded by plaintiffs, it is not the function of the Court in reviewing an injury determination of the Commission under the Antidumping Act to weigh the evidence or substitute its judgment for that of the Commission. *City Lumber Co., supra*, 457 F.2d at 993, 59 CCPA at 92; *Imbert Imports, supra*, 475 F.2d at 1191, 60 CCPA at 126. Moreover, since the Commission based its determination on a consideration of appropriate indicia of injury, absent any clear error of judgment (and I find none), the Commission's determination cannot be regarded as arbitrary and capricious. *Bowman Transportation, Inc., supra*, 419 U.S. at 285–86, 95 S.Ct. at 441–42; *Citizens to Preserve Overton Park, Inc., supra*, 401 U.S. at 416, 91 S.Ct. at 823.

With reference to the limitation on the Court's power to review the evidence before the Commission, the party-in-interest has called attention to *Deutsch v. United States Atomic Energy Commission*, 130 U.S.App. D.C. 339, 342, 401 F.2d 404, 407 (C.A.D.C. 1968), wherein the Court of Appeals made this relevant observation:

We are urged to overrule the [Atomic Energy] Commission's holding that petitioner is not entitled to an award upon the ground that this conclusion is arbitrary and capricious and lacks substantial evidence in the record supporting or justifying this ruling. We were told, moreover, on oral argument that the factual basis for the Commission's holding is clearly and completely erroneous as a matter of scientific knowledge and phenomenon. The briefs and supporting documents filed by both parties are extensively devoted to presentation and argument as to the correctness, or the falsity of scientific principles related to radioactive material and products, atomic energy, irradiation, the nucleus of the atom and the action and reaction of its protons and neutrons. We are therefore confronted at the very threshold of this case with the ever-recurring question of the scope and extent of our authority to set aside the ruling of an administrative agency. Despite our daily diet of challenges to administrative agency action and our resulting repeated efforts to articulate the limits of judicial review of such actions we nevertheless are continually called upon to substitute our judgment on factual issues for that of the agency charged by Congress with the initial responsibility of making, evaluating, and acting upon those facts. *It is well settled that the fact-finding function is within the exclusive province of the administrative agency.* We appear unable to establish a substantial recognition at the Bar that "*[t]he judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.*"

*Rochester Telephone Corp. v. United States,* 307 U.S. 125, at 146, 59 S.Ct. 754, at 765, 83 L.Ed. 1147 (1939). [Emphasis added; footnote omitted.]

In light of the above-cited decisions, it would be impermissible for me to substitute my judgment for that of the Commission or to reweigh the evidence as to specific factual findings. After a careful and searching review of the administrative record, I hold: that the factual findings of the Commission have a rational basis in fact; that the Commission applied the proper legal standards; and that the Commission considered appropriate economic and financial factors in making its negative determination. Accordingly, the Commission's determination is not arbitrary or capricious, as claimed by plaintiffs.

### IV

We now reach plaintiffs' contention that the Commission's injury determination is not supported by substantial evidence. As we have seen, the substantial evidence standard of review has been adverted to by the courts in reviewing the Commission's findings and determination under the Antidumping Act. See *City Lumber, supra,* 457 F.2d at 996, 59 CCPA at 95; *Imbert Imports, supra,* 475 F.2d at 1192, 60 CCPA at 127; *Pasco Terminals, Inc.,* supra, 477 F.Supp. 201, 83 Cust.Ct. at ——.

*Consolo v. Federal Maritime Commission et al.,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), is a leading case defining "substantial evidence". There, the Supreme Court observed (at 619–20, 86 S.Ct. at 1026):

> * * * We have defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. Labor Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be

drawn from it is one of fact for the jury." *Labor Board v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. This is something less than the weight of the evidence, and *the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Labor Board v. Nevada Consolidated Copper Corp.,* 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305; *Keele Hair & Scalp Specialists, Inc. v. FTC,* 5 Cir., 275 F.2d 18, 21. [Emphasis added; footnote omitted.]

See also *Richardson, Secretary of Health, Education, and Welfare v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

██ Applying the above-quoted definition to the record herein, I find that there is substantial evidence supporting the Commission's negative determination.[7] The fact that plaintiffs might be able to cite evidence in the record supporting conclusions inconsistent with those reached by the Commission does not mean that the Commission's determination is not supported by substantial evidence. Indeed, as pointed out in *Pasco Terminals, Inc., supra,* even if the Commission's determination were not one that the Court would have reached had the question first arisen in judicial proceedings, the Commission's determination must be upheld if rational and not contrary to law. It is emphasized that in deciding whether the Commission's determination meets the substantial evidence test, the Court does not look solely at the transcript of the public hearing and the public documents received by the Commission. The record before the Commission (and now before the Court) comprises a number of confidential documents, the content of which may not now be divulged or discussed in this opinion. Nevertheless, both defendant and the party-in-interest have submitted an "accounting" of the evidence in the record

---

7. This is not to imply that the Commission's determination must meet the "substantial evidence" test.

supporting each of the factual findings of the Commission, and it suffices to state that I find the Commission's determination is clearly supported by substantial evidence.

## V

■ As a further basis for overturning the Commission's determination in this case, plaintiffs urge that the Commission disregarded its own "precedents". Defendant and the party-in-interest, however, dispute that there is any inconsistency between the Commission's determination in the present case and its determinations in prior investigations. Moreover, defendant and the party-in-interest contend that the Commission's injury investigations are *sui generis*, and therefore injury must be decided by the Commission on a case by case basis. I agree.

■ Simply because a particular fact involved in a prior case is involved in the present investigation does not mean that the determination in the prior case is binding on the Commission in the present investigation. Plainly, in view of the unique combination and interaction of many economic variables presented in injury investigations, determinations in prior cases are of very limited guidance in future cases. This concept was well articulated by former Deputy Assistant Secretary of the Treasury James Pomeroy Hendrick in his article, "The United States Antidumping Act", 58 American Journal of International Law 914, 924 (1964):

> * * * The Tariff Commission, unlike American courts of law, is not bound by its own precedents. Even if it were, one must recognize that it is seldom that two cases are found which are truly alike. The elements may be similar, but often enough there can be subtle differences, apprehended only after careful study of the entire record, which justify an injury decision in one and a no-injury decision in the other case. * * * Most cases have

more than one element present, so that the decisions can very well depend upon a combination of elements rather than any single one at any time here mentioned.

Similarly, Assistant Secretary of the Treasury Kendall, testifying before the House Ways and Means Committee in 1957, expressed much the same thought when he stated:

> To try to define "injury" is very much like trying to define precisely some of the phrases of the common law or of equity where the court's tradition may and should come to its judgment by weighing all of the factors in balance; and in any one case the balance may be very different from that of another. Injury to a large corporation or to the owner of a chain of stores may be very different from injury to the corner grocer. Injury to one industry may be very different from injury to another. Under the same set of facts mathematically opposite conclusions or differing conclusions could be drawn. These are questions of economics, not sensitive to either exact science or to predetermined close lines or channels of thought. [Hearings on HR 6006, 6007 and 5120 at 44–45, 85th Cong., 1st Sess. (1957).]

In a word, the fact that the Commission found injury in another case, bears no relevance to whether injury should have been found in the instant case, absent proof of *identity of all factors.*

Further militating against the binding effect of prior determinations by the Commission in antidumping investigations is the circumstances that prior to the Trade Act of 1974, Pub.L.No.93–618, the Commission was "under no obligation either to disclose all of the evidence in its possession nor to state in meticulous detail exactly on what basis it applies that evidence in determining injury or likelihood thereof". *City Lumber Co., supra*, 457 F.2d at 996, 59 CCPA at 95.[8]

---

8. In the Trade Act of 1974, Congress provided that the Commission, upon making its determination, "shall publish in the Federal Register such determination, whether affirmative or negative, together with a complete statement of findings and conclusions, and the reasons or bases therefor, on all the material issues of fact or law presented (consistent with confidential

Simply put, and as previously mentioned, in antidumping investigations the Commission receives substantial amounts of confidential and sensitive information that cannot be disclosed to the general public.

## VI

Finally, plaintiffs have devoted an extensive portion of their memorandum to the subject of the quantum of injury required to make an affirmative injury determination. On this point, the proposition urged by plaintiffs is that the injury test was not intended by Congress to be a rigorous one, and "more than *de minimis*" injury is sufficient for a finding of dumping. Respecting the quantum of injury required for purposes of the Antidumping Act, the Senate Finance Committee commented in connection with the Trade Act of 1974 (S.Rep.No. 93–1298, 93d Cong., 2d Sess. (1974), at 180, U.S.Code Cong. & Admin.News 1974, pp. 7186, 7316):

> * * * Under the Antidumping Act, the Commission determines whether a domestic industry "is being or is likely to be injured, or is prevented from being established, by reason of the importation of" the less-than-fair-value imports. The term "injury," which is unqualified. by adjectives such as "material" or "serious," has been consistently interpreted by the Commission as being that degree of injury which the law will recognize and take into account. Obviously, the law will not recognize trifling, immaterial, insignificant or inconsequential injury. Immaterial injury connotes spiritual injury, which may exist inside of persons not industries. Injury must be a harm which is more than frivolous, inconsequential, insignificant, or immaterial.

Moreover, the law dos not contemplate that injury from less-than-fair-value imports be weighed against other factors which may be contributing to injury to an industry. The words "by reason of" express a causation link but do not mean that dumped imports must be a (or the) principal cause, a (or the) major cause, or a (or the) substantial cause of injury caused by all factors contributing to overall injury to an industry.

■ The foregoing Senate Finance Committee Report makes it evident that Congress intended the term "injury" under the Antidumping Act to be construed as something "more than *de minimis*" injury. However, I can perceive of no quantum issue in this case, inasmuch as the Commission's negative determination was not based upon a finding of *de minimis* injury. In point of fact, the Commission found no injury whatsoever. Consequently, I see nothing in plaintiffs' "more than *de minimis*" construction of the term "injury" that militates against the Commission's negative determination in the present case.

## CONCLUSION

For the foregoing reasons: plaintiffs' motion for summary judgment is denied; defendant's and party-in-interest's cross-motions for summary judgment are granted; and the action is dismissed.

---

treatment granted by the * * * Commission, * * * in the course of making its

determination)". See 19 U.S.C. § 160(d)(2) (1976).